All right. Please proceed. Good morning, Your Honors. I have pleased the Court. My name is Robert Martin. I'm the Counsel for Petitioners, Appellants Ronald Bloomfield and John Martin. For the record, my brother is John Martin, which explains how a tax lawyer has come to be involved in this case. I gave some thought to how I would begin the oral argument and how I would state the case, and in doing so, my mind went back to the fall of 1966 when I was a first-year law student at the University of Southern California. And there we were called upon to express cases and to state cases, and I had a professor, Howard Miller, who would stop us always at the beginning and say, who's suing who and for what? And that's where I'd like to start here. We have a question of who's suing who and for what. We have the Securities Exchange Commission in an administrative proceeding is suing my clients, Ron Bloomfield and John Martin. That much is certain. And what is the what? The problem with this case is that the case and the record and the opinions are littered with a lot of discussion of issues that have nothing to do with the charges that are in this case. This case, for example, is not about penny stocks. There are no rules that say that have been violated that have to do specifically with penny stocks. The case is not about market manipulation. There are no charges of market manipulation that my clients were involved with. The case is not about fraud in the sale of securities. There are no charges under 10b-5 or any fraud statutes of the securities law. There are two charges, and those charges are set forth in the order instituting proceedings on number one, that my clients violated the registration provisions of the Securities Act, specifically sections 5A and 5C thereof. Now, with respect to those charges, the problem in this case is there is no evidence in this case of violation of the registration provisions of the Securities Act. The only evidence that was offered to support that was evidence that the commission introduced that at the time of the sale of these securities in the public markets that there was no registration statement in effect. Now, there are 2 billion shares sold every single day in this country, and in virtually every single case there is no registration statement in effect. And the reason that there's no registration statement in effect is because none is required to be in effect. Absent an issuer, absent an underwriter, and absent a dealer in certain circumstances, there is no requirement for a registration statement. And so we have objected throughout in the briefs that there is no evidence has been presented of a violation of the registration provisions. The commission in its brief has tried to slide by that by saying, okay, we showed there was no registration statement, and therefore all we have to do is show a prima facie case, and therefore it's the responsibility of the petitioners to go and establish an availability of an exemption. But the problem is, is that what is cited in favor of that proposition is inconsistent. In fact, actually the case that was cited was SEC versus Murphy that was decided in this circuit in 1980. And in fact, what that case says, citing the Supreme Court, is once the SEC introduces evidence that a defendant has violated the registration provisions, the defendant then has the burden of proof in showing entitlement to an exemption. This court, for example, has also cited with approval the Wansover case involving the DC circuit, said that, and this has to do with the Section 4.4 exemption, if the broker after reasonable inquiry is not aware of circumstances indicating that the person for whose account the securities are sold is an underwriter with respect to the securities, or that the transaction is part of a distribution of securities, of the issuer. So the prima facie case has to be more than just the absence of a registration statement. There has to be evidence of the violation. We have to find an issuer, an underwriter, an unregistered distribution of securities, and it's simply not there in this case. There is simply no evidence that establishes that. The second charge that was brought against my clients is that they violated the broker suspicious activity report rule. Actually, that they aided and abetted the violation of that rule. The problem with this, first of all, is that the broker was never party to this proceeding. Lieb was never brought into the proceeding. There was no case brought against Lieb that says that Lieb has violated the suspicious activity report and has failed to file that report. There was, as part of this proceeding, Robert Gorgia, who was their chief compliance officer. He was the anti-money laundering officer. He made the determination that those suspicious activity report ought to be submitted back in New York, and we don't have any specific findings that would support a necessity of filing a suspicious activity report. But more to the point here is this is an aiding and abetting charge, and it's black-letter law that in order to support an aiding and abetting charge, there has to be scienter. There has to be a finding, and the way this court has described it, is that aiding and abetting determination, the term recklessness is defined as a highly unreasonable omission involving not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must be punished. That's the standard, and yet there's no reason to believe that we have brokers located 3,000 miles away who are unaware of any and testify they're unaware of any suspicious activity who somehow aided and abetted a failure to file by the outfit in New York that the chief compliance officer who was responsible for filing this, it's just simply not there. And so when I go after the question of who's suing who and for what, I've got two what's here, violation of the anti-registration, violation of the registration provisions of the act, and a violation of this requirement that there be aiding and abetting a violation that has not been established of the requirement to file suspicious activity reports. Can I ask you, when you talked about the scienter requirement, what case are you relying on for that proposition? I'm sorry. And I have a not only a hearing problem, but I also have a cold today, which is that's fine. Can you hear me now? Can you hear me now? Thank you. I asked what case you were relying on. For the proposition of the record. No, I'm sorry. Are you making a distinction? So we're just talking about recklessness then, knowing or reckless, correct? Yes. The recklessness case is the Hollinger versus Titan Capital Corp. Okay. Thank you. There are no further questions, Your Honor. I would like to reserve my time to reply. Certainly. Thank you. Mr. Martin tells us that a broker selling unregistered securities doesn't violate Section 5A and 5C of the 1933 Act. Do you agree with that? That's wrong. That's wrong. Tell us why. Absolutely, Your Honor. Pardon me. I should have let you state your name first. Yes, Your Honor. My name is Daniel Staroselsky. I represent the Securities and Exchange Commission. And so I'm happy to go over these requirements. I think the court, this whole issue is squarely controlled by this court's decision in the World Trade Financial matter. And the way the registration requirements work is you start out with Section 5 of the Securities Act. And that states a broad rule that there needs to be a registration statement on file or in effect if a security is authored or sold. And then to allow ordinary trading in the markets, there are the exemptions from Section 5 that are contained in Section 4A of the Securities Act. But as World Trade Financial makes clear, as soon as the commission makes out a prima facie case by showing what? By showing that there is no registration statement in effect for a particular sale. And there was a sale. And there was a sale as there were millions of, well, there were many sales, millions of shares traded. Then the burden shifts to the party claiming the exemption to support the exemption. Now, the exemption that is commonly used for ordinary trading is contained in Section 4A1 of the Securities Act. And but the problem here is that what was happening was the antithesis of ordinary trading. This isn't a situation where a customer buys 100 shares of Microsoft on the open market and then sells it the next day. We had large blocks of obscure, thinly traded securities being deposited into. Not bought by the broker. That's the whole case, Your Honor. Yes. And in those circumstances, if petitioners can do one of two things. If they want to prove up the 4A1 exemption, which is for ordinary trading, they can do that or they can try to do that. And they can say, look, the customers that I'm selling for, they're not an issuer, an underwriter. They're not affiliated with the company in any sort of way. So but it's their burden. And World Trade Financial is 100 percent clear on this because the argument that was made in that case is the same exact argument that was made here. The commission found that there were red flags of an unlawful distribution, but didn't say that there actually was one. And the petitioners came to this court and they said, wait a minute. If the commission wants to show that there's not an underwriter, it's it's it's burden to do that. And this court flat out rejected that. The other point that I really want to emphasize. Does that answer your honor's question? Yes. And then also the 4A1 exemption can be proven by other circumstantial evidence, such as the period of time that the stock has been in the account without trading. It's a facts and circumstances determination. But the reason it doesn't present a chilling effect on the market, as petitioners are saying the court should be concerned about is because it is because it's really designed for ordinary trading. And as your honor said, you know, a customer buys shares on the open market, reselling them. That's what the exemption is designed to do. The other point that I really wanted to stress about this is these registration requirements. This isn't a technical requirement. This is the method that Congress deemed essential for investors to make informed decisions. And the necessity of the requirement is particularly urgent in a case like this, where it's obscure issuers trading millions of shares of stock. And the commission has for a very long time said that if a broker wants to rely on the Section 4A4 exemption, it's up to the broker to prove it up and to make a reasonable inquiry into the circumstances under which the issuer acquired the shares, so that the broker can be sure it's not participating in an unlawful distribution. And that's very important. But Mr. Martin tells us that millions and billions of shares are traded every day that are unregistered. That's right. Well, and they're traded through brokerage houses. That's right. And are we saying that all those people are violating the 1933 Act? Absolutely not. Absolutely not. All right. Well, square those two concepts for me, would you please? I'd be happy to, your honor. The way that the ordinary trading occurs is it's exempt from registration requirement. So the registration requirement, it's concerned with the movement, with the distribution of stock from an issuer or, you know, insiders, persons closely affiliated with it, into the hands of the investing public. What happens in ordinary trading is that's not what happens with ordinary trading, right? If I go online and I buy 100 shares of Microsoft stock, I'm not affiliated in any way with Microsoft. And so that and then if I choose to sell it later on, that's why there's no registration. Microsoft is a registered security. Right. Right. So initially there needs to be a- How do billions of shares of unregistered securities get traded every day without having all brokers in the who's go? There's a registration statement that's filed for a distribution. But once the shares come to rest in the hands of the investing public, then that ordinary trading after the distribution doesn't need to be exempt or is exempt from registration. There's no- Because there's a registration statement on file. For the initial, for the distribution, yes. But here we are dealing with shares that did not have a registration statement, true? Or does it make any difference? No, it's undisputed in this case that there was no registration statement. So all nine securities that were traded? It's undisputed, Your Honor, that there was none. Can I ask a public policy question? Are you suggesting, then, that the broker is somewhat of the gatekeeper here since they're in the best position, so to speak, to figure these things out if there is no registration statement? Or what is the policy underlying this approach? That's exactly right, Your Honor. They're the gatekeeper. The commission has said since at least 1962 this court affirmed in the World Trade Financial decision that a broker is not a mere order taker. A broker stands between people who may wish to access the capital markets and investors, and they're in a unique position to protect investors, and that's why they're required to act accordingly. If there are no further questions with respect to this, the registration requirements, I'd like to move to the reporting violations. I heard Mr. Martin say basically two things. Number one, he talked about that Lieb, the broker, was not a party to the proceeding. That's not required in an aiding and abetting case. The second point goes to Sienter, and the showing of the petitions acted knowingly, or at the very least recklessly, is supported by, I think, two basic sets of facts in the record. Number one, they knew, and they can see this at page 20 of their brief, that they had an obligation to comply with these reporting requirements, or that Lieb did. And second, petitioners did absolutely nothing about it, even though there were ample red flags, and people all around them were waving these red flags. So the conduct that we're talking about occurred after petitioners were asked to leave their previous employer for engaging in the very same type of activity with the very same customers. Then they continued to engage in that activity again and again and again, even though the commission, other regulators, the clearing firms that petitioners dealt with, and even the chief compliance officer at their firm expressed serious concerns about their conduct. And yet they point the court to a couple of places in the record. If you look at supplemental excerpts of Record 401, Mr. Martin said that he never considered recommending the filing of a suspicious activity report. Mr. Bloomfield testifies at excerpts of Record 139 that, you know, if he suspected something, he would have filed a report, or he would have had one filed. They decided to do nothing about it. So this is the very circumstance in which it's reasonable to hold them accountable for the conduct at the firm. If the court has any further questions. As to this point, I think the point is made by the appellants that there is no 10B violation charge here as to the actual clients who sold the shares, correct? No, well, they argue this. That's not quite correct, Your Honor. The commission did pursue the actual, the Usseltons, and there was a settlement with them where they agreed for some of the conduct involved in this case that petitioners did not alert federal authorities to. And as part of that settlement, the Usseltons agreed to pay back, I think it was about $2.8 million in disgorgement. They agreed to pay a $1 million civil penalty as well. The other point that I would make on this is this is an important prophylactic requirement, this reporting requirement. It's designed to get information into the hands of law enforcement, and so to allow law enforcement to help detect fraud, to stop it at early stages. The commission talked about in its opinion how this has been useful to the commission. One of the reasons it's so useful, in fact, is because it comes from professionals in the field. And oftentimes we get reports from disgruntled persons who are concerned about something. But the key when a broker or someone in the field makes a report, it's very specific, and it can really be used by law enforcement to react proactively. And so that's why it's important in and of itself, quite apart from whether the commission ultimately sued the customers or not. The court has any further questions? No, I noticed that Mr. Martin did not question the extent of the money fines, so therefore he won't be able to argue that on rebuttal. So we'll submit that on the briefs. Okay. Thank you, Your Honor. We ask that the court affirm. Counsel for the government cites the World Trade Financial Corporation case. In fact, it's cited 18 times in their brief. And it's useful to take a look at that case because that case involved a case where, in fact, evidence that there was an unregistered offering of securities was presented and was found by both the commission and by the court. What happened in that case is the brokers fell back on the 4-4 exemption by saying that they didn't know that, and that's where the question of reasonable inquiry came up, because the rule of 4-4 says that there has to be a reasonable inquiry. But the purpose of a reasonable inquiry is to find out something. And what would they have found out? If the commission opinion is examined at World Trade Financial Corp., you will find that it was undisputed, and I can read this from it, from December 20, 2004, to March 24, 2005, World Trade through Brickle, that was the broker, sold more than 2.3 million shares of iStorage stock to the public on behalf of three customers who had received those shares from the 12.5 percent shareholders. Brickle admittedly knew that his customers received stock from issuers as compensation. He also knew that they intended to use the World Trade accounts to liquidate the stock. Notwithstanding these facts, Brickle failed to ask whether his customers received the shares from iStorage or from an issuer or from a controlled person of the company. The record shows that had Brickle done so, he would have learned that the customers obtained their shares from the 12.5 percent shareholders, whose ownership interest in iStorage and coordinated sales of a large block of its stock a week after the reverse merger, were strong indicia that they controlled iStorage, and their sales of iStorage shares were part of an unregistered distribution. Council talks about red flags. This case has got a lot of discussion of red flags. But what is a red flag? A red flag is supposed to draw your attention to something. And what is missing in this case is what the red flag showed. Did the red flag show an unregistered distribution of stock? Did it show sales by a controlled person? Did it show sales by 12.5 percent shareholders as in World Trade? The answer is no. That evidence was never introduced. We're talking about red flags in an absence, in a vacuum. The issue of reasonable inquiry is to find out something. It's not such a vacuum when the account receives millions of shares as deposits that are not bought by the broker and the broker sells them. I'm sorry, Your Honor, I'm having difficulty hearing you. It's not in a vacuum where the account receives millions of shares of thinly traded securities. Well, that's correct, Your Honor. Isn't that a red flag? No, that is not a vacuum. And the issue then is reasonable inquiry. But the point of the— And what reasonable inquiry do these people say? How did you get these shares, Usulton? How did you get these shares, Thimble, in the Nevis Corporation? Where did you get these shares? You didn't buy them through us. How come you got these shares? What role are you playing here? None of those questions were asked. Well, that's what the reasonable inquiry is about.  In fact, they did ask them where they got the shares. The point is, is that the commission never produced evidence that those shares were part of any unregistered distribution of stock. Well, they got to prove that they're not underwriters. In other words, that they are not conduits for—from the issuer to the market. And there was no proof that they were anything but underwriters. Okay. Go ahead. I wanted to address—well, that's where I was at with the question of the reasonable inquiry. The question of a reasonable inquiry is, what would it have found out? And was it a distribution by an issuer? Was it a distribution by a control person? And the prima facie case of the distribution of unregistered shares, is the obligation of the commission to bring forth, and they did not do so. And that being the case, then the reasonable inquiry question is really mooted. Okay. Thank you very much. Thank you, Your Honor. All right. Court thanks counsel for their presentations. And the case of Bloomfield v. SEC is submitted for decision.
judges: Fernandez, Bea, Rogers